# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JUDY BURTON CATES,

        Plaintiff,

v.                                    Case No:  6:16-cv-351-Orl-DCI

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

_____

## MEMORANDUM OF DECISION

Judy Burton Cates (Claimant) appeals the Commissioner of Social Security's final decision denying her applications for disability benefits and supplemental security income.  Doc. 1.  Claimant argues that the Administrative Law Judge (ALJ) erred by: 1) discounting Claimant's credibility; and 2) failing to give appropriate weight to the opinions of two of Claimant's treating physicians, Dr. Nermeen Saleh (a primary care physician) and Dr. Sunita Tikku (a psychiatrist).  Doc. 33 at 20.  Claimant requests that the matter be reversed and remanded for an award of benefits or, in the alternative, remanded for further proceedings.  *Id*. at 33.  For the reasons set forth below, the Commissioner's final decision is **AFFIRMED**.

## I.    <u>PROCEDURAL HISTORY</u>.

This case stems from Claimant's applications for disability insurance benefits and supplemental security income.  R. 40.  Claimant alleged a disability onset date of June 30, 2008.  *Id*.  On September 20, 2014, the ALJ entered a decision finding that Claimant was capable of performing light work and could perform her past relevant work.  R. 45-53.  Thus, the ALJ concluded that Claimant was not disabled.  R. 53.  As conceded by the Commissioner, Claimant

timely pursued her administrative remedies, and this matter is ripe for review under 42 U.S.C. §§ 405(g) and 1383(c)(2).  Doc. 36 at 1.

## II.      THE ALJ'S DECISION.

The ALJ issued the operative decision on September 20, 2014.  R. 40-53.  The ALJ found that Claimant had the following severe impairments: joint pain and depression.  R. 42.  The ALJ also found non-severe impairments of stable gastrointestinal issues and clinically stable polycythemia.  *Id.*  The ALJ found that Claimant does not have an impairment or combination of impairments that meets or medically equals any listed impairment.  R. 43-45.

The ALJ found that Claimant had the residual functional capacity (RFC) to perform light work as defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b),[1] with the following specific limitations:

> sit, stand, and walk each for eight hours in an eight-hour day; no climbing ropes, ladders or scaffolds; occasional bending, balancing, stooping, squatting, crouching, crawling, kneeling, and climbing of ramps and stairs; no overhead lifting but has full use of upper extremities otherwise; no heights or vibrations; and no production paced demands.

R. 45.  The ALJ, in light of this RFC, found that Claimant was able to perform her past relevant work as an office manager (a skilled, sedentary position), because that work does not require the performance of work-related duties precluded by the RFC.  R. 52-53.  Thus, the ALJ found that

---

[1] Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 C.F.R. §§ 404.1567(b), 416.967(b).

Claimant was not disabled from her alleged onset date, June 30, 2008, through the date of the decision, September 20, 2014. *Id.*

III.    <u>**STANDARD OF REVIEW.**</u>

"In Social Security appeals, [the court] must determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (quotations omitted). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560. The District Court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner].'" *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

## IV.    ANALYSIS.

### 1.  Credibility

Claimant argues that the ALJ's reasons supporting her credibility determination are not supported by substantial evidence.  Doc. 33 at 20-28.  The Commissioner essentially argues that the ALJ's credibility finding is supported by substantial evidence, even if some of the specific reasons stated by the ALJ are incorrect or not supported by substantial evidence.  Doc. 36 at 4-8.

A claimant may establish "disability through his own testimony of pain or other subjective symptoms."  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  A claimant seeking to establish disability through his or her own testimony must show:

> (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).  If the ALJ determines that the claimant has a medically determinable impairment that could reasonably produce the claimant's alleged pain or other symptoms, the ALJ must then evaluate the extent to which the intensity and persistence of those symptoms limit the claimant's ability to work.  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  In doing so, the ALJ considers a variety of evidence, including, but not limited to, the claimant's history, the medical signs and laboratory findings, the claimant's statements, medical source opinions, and other evidence of how the pain affects the claimant's daily activities and ability to work.  *Id*. at §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3).  "If the ALJ decides not to credit a claimant's testimony as to her pain, he must articulate explicit and adequate reasons for doing so."  *Foote*, 67 F.3d at 1561-62.  "Credibility determinations are the province of the ALJ."  *Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th Cir.2005).  The Court will not disturb a clearly articulated credibility finding that is supported by substantial evidence.  *Foote*, 67 F.3d at 1562.

The ALJ held a hearing in this case on July 1, 2014. R. 69-110.[2] At the hearing, Claimant testified that she had essentially raised her grandson from his birth in late 2005, with the assistance of her husband (prior to his death in 2011), neighbors, and friends from church. R. 81-82. Claimant also acknowledged that, on her alleged onset date, she was laid off from her prior employment due to a downturn in the economy, and did not leave her employment due to her alleged disability. R. 82-83. Thereafter, Claimant collected unemployment and looked for new work, but was unable to find any. *Id.* However, Claimant asserted that her depression, anxiety, and joint pain had been increasing prior to her termination, and that she ultimately was unable to work due to her medical issues. R.83-85. Claimant asserted that her medical issues caused her myriad problems and caused her to be unable to complete many activities of daily living without assistance from others, including shopping, cooking, caring for her grandson, and taking care of her house. R. 86-101. Claimant explained that her joint pain and arthritis affected her shoulders, back, knees, and wrists and prevented her from reaching, stooping, crouching, and lifting objects. *Id.* Further, Claimant stated that her anxiety and depression caused her to have panic attacks and experience extreme stress, and that she also suffered from forgetfulness and from fatigue that required her to take naps each day. *Id.* In posing questions to the vocational expert, Claimant's attorney included proposed restrictions that Claimant had to take one or two naps (of an hour or more in duration) per day, and also that she had daily panic attacks that lasted anywhere from a half-hour to an hour-and-a-half. R. 104. While the vocational expert found that Claimant could perform her past relevant work (that of an office manager) based on the ALJ's hypothetical, the

---

[2] Claimant was represented during the hearing by the same attorney that represents her in this matter. R. 69.

vocational expert agreed that the additional restrictions suggested by Claimant's counsel would preclude all work. *Id*.

In her decision, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but concluded that her statements concerning the intensity, persistence, and limiting effects of her symptoms are "not entirely credible for the reasons explained in this decision." R. 46. Specifically, the ALJ explained:

> Turning to the medical evidence, the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations. More specifically, the medical findings do not support the existence of limitations greater than the above listed residual functional capacity. In terms of the claimant's alleged conditions, the medical record demonstrates that the doctors have diagnosed the claimant's symptoms as joint pain and depression.

R. 46. The ALJ also relied on Claimant's activities of daily living, particularly the full-time care she provides to her grandson, in determining Claimant's credibility. R. 46, 51. Therefore, the ALJ found that Claimant's allegations concerning the intensity, persistence, and limiting effects of her symptoms "not entirely credible" because the medical evidence does not support those allegations. *Id*.

In asserting that the ALJ's credibility determination was not supported by substantial evidence, Claimant made numerous, brief arguments that the ALJ misstated the facts and disregarded the medical evidence supporting Claimant's position. Doc. 33 at 20-28. Specifically, Claimant made the following arguments:

1. The ALJ inaccurately stated that Claimant traveled out of town to care for her octogenarian mother (Doc. 33 at 22, referencing R. 50);

2. The ALJ took into consideration the fact that Claimant collected unemployment and unsuccessfully sought work following the alleged onset date (*Id*. at 22-23, referencing R. 46, 83-84);

3. The ALJ "cherry picked" medical evidence that supported the ALJ's decision (*Id*. at 23, referencing R. 48, 571-72, 592-96);

4. The ALJ's observation that Claimant did not fill a prescription for Omeprazole was "only partially true" (*Id*., referencing R. 48, 573-74);

5. The ALJ implied that Claimant chose to purchase cigarettes rather than pay for medical services (*Id*. at 24, referencing R.47);

6. The ALJ referred to "psychological testing," but "testing" allegedly typically refers to objective medical tests, and the record contains only evidence of subjective evaluations (*Id*. at 24, referencing R. 51, 962-74);

7. The ALJ improperly implied that Claimant's symptoms must have been improving because she refused any medication changes (*Id*. at 24, referencing R. 51);

8. The ALJ inappropriately focused her attention on the mental status reports and GAF scores, but paid little attention to the reactions Claimant allegedly had to increased stress and medication adjustments (*Id*. at 25-26, referencing R. 51);

9. The ALJ ignored Claimant's functional report, which indicated that Claimant no longer participated in church events (*Id*. at 26, referencing R. 418-20);

10. The ALJ ignored Claimant's testimony, and the fact that Claimant's testimony and functional reports were allegedly "consistent with the medical records" (Id. at 26-27, referencing R. 85-99);

11. The ALJ questioned Claimant's credibility on the basis that she took public transportation (*Id*. at 27-28, with no accompanying citation to the Record); and

12. The ALJ "seem[ed] to question the treatment plans of the various [medical] providers" (*Id*. at 28, referencing R. 46-47).

The Court has considered whether the ALJ's reasons in her decision support her credibility determination and are supported by substantial evidence. The ALJ found that the medical record demonstrates that Claimant's allegations concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. R. 46; *see* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996). Specifically, the ALJ couched her credibility determination in terms of how the medical evidence did not support any more restrictive limitations than those set forth in the RFC. R. 46. And in the pages and paragraphs of the ALJ's decision that followed that credibility determination, the ALJ discussed the medical evidence, often describing how that evidence related to the RFC.

For example, after discussing medical records from Florida Hospital Fish Memorial dated from 2012, the ALJ stated that "these findings clearly show that the claimant was capable of performing work related activities within the residual functional capacity." *Id*. at 47. Those records included physical examinations in which Claimant denied experiencing back pain, had normal range of motion, and showed normal strength. *Id*. (citing Exhibits 3F and 5F). The ALJ also discussed a May 2012 consultative examination by a physician that found, among other things, that Claimant was able to independently complete her activities of daily living and had full strength. *Id*. at 47. The ALJ explained that "none of those findings contradict the residual functional capacity above." *Id*. As another example, the ALJ discussed December 2012 records from Florida Hospital Fish Memorial that, among other things, showed that upon mental status

testing Claimant displayed "appropriate appearance, full orientation, unremarkable behavior, unremarkable psychomotor behavior, appropriate speech, constricted affect, euthymic mood, intact memory, average intellect, cooperative attitude, good attention, fair reasoning, fair judgment, fair insight, logical thought process, and unremarkable thought content." *Id*. at 50. The ALJ explained that "these fairly normal findings are consistent with the residual functional capacity." *Id*. In addition, the ALJ considered medical records from PRC Associates from January and June 2014 that showed no deficits in strength and no psychiatric abnormalities, and only mild right knee tenderness. *Id*. at 51. The ALJ concluded that none of those findings "would preclude the claimant from performing work within the residual functional capacity." *Id*. These reasons, along with the ALJ's other reasons, support her credibility determination, and are supported by substantial evidence. *See, e.g.*, R. 43-52. Therefore, the Court finds that the ALJ's credibility determination is supported by substantial evidence.

Claimant, in asserting that the ALJ's decision is not supported by substantial evidence, identifies approximately a dozen reasons purportedly undermining the ALJ's determination. Doc. 33 at 20-28. A few of these arguments are somewhat compelling; particularly the first assertion that the ALJ misstated the evidence in relation to Claimant caring for her octogenarian mother, something that does not appear to be part of the evidence in this matter. However, even if some of the reasons cited by the ALJ are incorrect (or otherwise not supported by substantial evidence), the fact that substantial evidence supports the decision as a whole is cause to affirm that decision. *See Wilson v. Comm'r of Soc. Sec.*, 500 F. App'x 857, 859-60 (11th Cir. 2012) (noting that remand was unwarranted even if the ALJ cited an improper finding to support his adverse credibility determination because there was sufficient evidence within the record to support the ALJ's other reasoning for his adverse credibility determination); *Ellison v. Barnhart*, 355 F.3d 1272, 1275

(11th Cir. 2003) (holding that an ALJ's failure to consider a claimant's inability to afford treatment did not constitute reversible error when the ALJ did not rely primarily on a lack of treatment to find that the claimant was not disabled); s*ee also D'Andrea v. Comm'r of Soc. Sec. Admin.*, 389 F. App'x 944, 948 (11th Cir. 2010) (per curiam) (rejecting argument that ALJ failed to accord proper weight to treating physician's opinion "because the ALJ articulated at least one specific reason for disregarding the opinion and the record supports it."); *see also Gilmore v. Astrue*, 2010 WL 989635, at *14-18 (N.D. Fla. Feb. 18, 2010) (finding that the ALJ's decision to discount a treating physician's opinion was supported by substantial evidence, even though two of the many reasons articulated by the ALJ were not supported by substantial evidence).

Most of Claimant's assertions, though, are simply requests that this Court weigh the evidence and find that it preponderates against the ALJ's decision. However, this Court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner].'" *Phillips*, 357 F.3d at 1240 n.8 (quoting *Bloodsworth*, 703 F.2d at 1239). Here, as set forth in the foregoing paragraphs, the Commissioner's decision is supported by substantial evidence. Thus, the Court must affirm even if the Court found that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3 (11th Cir. 1991).

The Court has reviewed the evidence of record and the ALJ's decision concerning Claimant's credibility, a decision uniquely within the province of the ALJ, and the Court finds that the decision is supported by substantial evidence. In discounting Claimant's credibility, the ALJ cited to the medical evidence, which, contrary to Claimant's testimony, contained an extensive record of Claimant presenting during the alleged period of disability with significantly less severe – or no – complaints and observations concerning both Claimant's mental health and pain issues, as well as Claimant's daily activities. To the extent the ALJ erred by, for example, citing a piece

of evidence not within the record, that error is harmless because substantial evidence supports the ALJ's credibility determination.

## 2. **Physician Opinions**

Claimant maintains that the ALJ's reasons for assigning no weight to Dr. Saleh's and Dr. Tikku's opinions are not supported by substantial evidence. Doc. 33 at 29-33. Thus, Claimant argues that the ALJ erred by assigning no weight to Dr. Saleh's and Dr. Tikku's opinions. *Id.* Contingent on those alleged errors in weighing the doctors' opinions, Claimant also asserts that the ALJ erred by failing to take into account all of Claimant's limitations and, thus, the resulting RFC was deficient, as was the resulting hypothetical posed to the vocational expert. *Id.* at 29-33. The core issue, though, is that the ALJ allegedly erred in weighing the doctors' opinions. *See id.*

The Commissioner maintains that the ALJ provided good cause reasons for assigning Dr. Saleh's and Dr. Tikku's opinions no weight, and that the ALJ's decision in doing so is supported by substantial evidence. Doc. 36 at 8-11. Thus, the Commissioner argues that the ALJ did not err by assigning no weight to Dr. Saleh's and Dr. Tikku's opinions. *Id.*

The ALJ assesses the claimant's RFC and ability to perform past relevant work at step four of the sequential evaluation process. *Phillips*, 357 F.3d at 1238. The RFC "is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The ALJ is responsible for determining the claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c). The consideration and weighing of medical opinions is an integral part in determining the claimant's RFC. The ALJ must consider a number of factors in determining how much weight to give each medical opinion, including: 1) whether the physician has examined the claimant; 2) the length, nature, and extent of the physician's relationship with the claimant; 3) the medical evidence and explanation supporting

the physician's opinion; 4) how consistent the physician's opinion is with the record as a whole; and 5) the physician's specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c).

A treating physician's opinion must be given controlling weight, unless good cause is shown to the contrary. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (giving controlling weight to the treating physician's opinion unless it is inconsistent with other substantial evidence); *see also Winschel*, 631 F.3d at 1179. There is good cause to assign a treating physician's opinion less than substantial or considerable weight, where: 1) the treating physician's opinion is not bolstered by the evidence; 2) the evidence supports a contrary finding; or 3) the treating physician's opinion is conclusory or inconsistent with the physician's own medical records. *Winschel*, 631 F.3d at 1179. Critically, the ALJ must state the weight assigned to each medical opinion, and articulate the reasons supporting the weight assigned to each opinion. *Id*. The failure to state the weight with particularity or articulate the reasons in support of the weight prohibits the Court from determining whether the ultimate decision is rational and supported by substantial evidence. *Id*.

### Dr. Saleh's Treatment Notes and Opinion

The record reveals that Claimant began treating with Dr. Saleh, her primary care physician, in about 2012. R. 442. On August 21, 2012, Claimant presented for a possible urinary tract infection (UTI). R. 646-49. Other than the UTI symptoms, Claimant's physical examination was entirely unremarkable and, as to her psychiatric state, Dr. Saleh noted "[n]o unusual anxiety or evidence of depression." R. 648.

On January 21, 2013, Claimant visited Dr. Saleh for a follow-up examination in relation to Claimant's visits to cardiology and pulmonology specialists. R. 701-04. Claimant complained of back pain, but a physical examination was unremarkable. R. 703. Dr. Saleh also noted that Claimant's affect was normal, although she appeared anxious. *Id*.

On March 4, 2013, Claimant visited Dr. Saleh complaining of a UTI and right shoulder pain. R. 706-10. Other than the right shoulder, Claimant's physical examination was unremarkable, and Dr. Saleh recommended treatment for Claimant's shoulder that included heating pads and exercise. R. 708. Dr. Saleh also noted "[n]o unusual anxiety or evidence of depression." *Id*.

On April 26, 2013, Claimant visited Dr. Saleh complaining of back pain, which was described as having a sudden onset, without injury. R. 716-19. Claimant's physical examination, including musculoskeletal and psychiatric, was unremarkable, and Dr. Saleh noted that Claimant had normal muscle tone, no spasms, no tenderness, and appropriate mood and affect. R. 717-18.

On October 24, 2013, Claimant visited Dr. Saleh complaining of back pain and fatigue. R. 720-23. This was an initial visit for fatigue, which was described as having a sudden onset. R. 720. As for the back pain, Claimant reported that the back pain was of moderate severity and had worsened, but Claimant denied any associated weakness. *Id*. Claimant's physical examination was normal, and Dr. Saleh stated that Claimant displayed an appropriate mood and affect. R. 721.

On November 13, 2013, Claimant visited Dr. Saleh for a follow-up. R. 724-27. During the visit, Claimant reported joint pain and joint swelling, but her physical examination was otherwise normal. R. 725-26. Her anxiety symptoms were noted as stable. R. 726.

On June 23, 2014, Dr. Saleh completed a "Physical Residual Function Capacity Assessment," which is Dr. Saleh's opinion that is at issue in this matter. R. 1006-13. In that Assessment, Dr. Saleh opined as to several exertional limitations. *Id*. Dr. Saleh opined that Claimant could occasionally *and* frequently lift and carry (including upward pulling) 10 pounds but not 25 pounds, could stand or walk less than two hours in an eight-hour workday, must periodically sit and stand to relieve pain, and had limitations in upper and lower extremities in

relation to pushing and pulling related to wrist pain, shoulder pain, and knee pain from tendonitis and arthritis. R. 1007. However, Dr. Saleh did not explain why the evidence supported her conclusions, as requested on the assessment form. *Id*. Dr. Saleh also opined that Claimant could never climb ramps or stairs, but, strangely, could occasionally climb ladders, ropes, and scaffolds. R. 1008. Dr. Saleh opined that Claimant could never kneel or crawl, but provided no indication as to whether Claimant could balance, stoop, or crouch, and again did not explain why the evidence supported her conclusions, as requested on the assessment form. *Id*. Dr. Saleh opined that Claimant was "limited" in reaching in all directions, handling, fingering, and feeling, but once again did not explain why the evidence supported her conclusions, as requested on the assessment form, and did not explain the nature of the limitation, as requested on the assessment form. R. 1009. Dr. Saleh opined that Claimant was limited in speaking, and in response to the assessment form query as to the nature of the limitation, Dr. Saleh wrote "forgetful," although Dr. Saleh again did not explain why the evidence supported her conclusions, as requested on the assessment form. R. 1010. Dr. Saleh opined that Claimant must avoid all exposure to extreme cold, extreme heat, noise, and humidity, but provided no indication as to whether Claimant could tolerate wetness, vibration, fumes, or hazards. *Id*. In response to the assessment form query as to the nature of the limitation, Dr. Saleh wrote "noise increase her anxiety[,] humidity makes it hard to breath[,] cold [increases] joint pain," although Dr. Saleh again did not explain why the evidence supported her conclusions, as requested on the assessment form. *Id*. Dr. Saleh provided no additional comments or explanations.

### *Dr. Tikku's Treatment Notes and Opinion*

The record reveals that Claimant began treating with Dr. Tikku, a psychiatrist, on September 25, 2012, based on a referral from Dr. Saleh. R. 442-43; 763-66. At the initial

evaluation, Claimant's primary complaint was mood swings. R. 763. Claimant also complained of poor attention, poor concentration, racing thoughts, difficulty sleeping at night, and poor appetite. *Id*. Claimant reported that she felt easily overwhelmed and had difficulty coping with daily stressors. *Id*. Claimant explained that she lost her son and husband on Thanksgiving. *Id*. Claimant also reported drinking six sodas a day, being a daily smoker, exercising daily, and having a healthy diet. *Id*. According to Dr. Tikku, Claimant's mental status and behavior were mostly unremarkable, Claimant was able to maintain attention, and her memory was intact. R. 615-16. Claimant's mood was described as depressed, and her reasoning, impulse control, judgment, and insight, were described as fair. *Id*. Based on that initial evaluation, Dr. Tikku stated that Claimant met the criteria for depression, single episode, moderate, with problems related to finances, occupation, and primary support group, and a GAF of 52. R. 766. Dr. Tikku stated that Claimant would benefit from the addition of a mood stabilizer to her medication regimen. *Id*. Dr. Tikku treated Claimant on five additional occasions: October 15, 2012, December 19, 2012, April 3, 2013, June 7, 2013, and September 5, 2013. R. 763-84. Dr. Tikku's treatment notes from this period, though, did not contain any functional limitations. *See id*.

On October 15, 2012, Claimant saw Dr. Tikku for a medication follow-up. R. 769-71. At that visit, Dr. Tikku described Claimant as somewhat calm, and Claimant reported that her mood had been somewhat better, although Claimant self-reported difficulty sleeping, anxiousness, racing thoughts, and difficulty in her daily functioning. R. 769-70. According to Dr. Tikku, Claimant's mental status and behavior were mostly unremarkable, Claimant was able to maintain attention, and her memory was intact. *Id*. Claimant's mood was described as anxious, and her reasoning, impulse control, judgment, and insight, were described as fair. *Id*. Dr. Tikku determined Claimant's GAF to be 54 and adjusted Claimant's medication. R. 770-71.

On December 12, 2012, Claimant saw Dr. Tikku for a medication follow-up. R. 773-75. During that visit, Claimant appeared as "much calmer" and reported "feeling much calmer" and coping with daily stressors "fairly." R. 773-74. According to Dr. Tikku, Claimant's mental status and behavior were mostly unremarkable, Claimant was able to maintain attention, and her memory was intact. *Id*. Claimant's mood was described as euthymic and affect constricted, and her reasoning, impulse control, judgment, and insight, were described as fair. *Id*. Dr. Tikku determined Claimant's GAF to be 54 and continued Claimant's current medication. R. 774-75.

On April 3, 2013, Claimant visited again with Dr. Tikku, and received supportive therapy. R. 777-78. Dr. Tikku noted that claimant was depressed. *Id*. Claimant reported difficulty coping, and that her son has been incarcerated, her car has been repossessed, and she has been caring for her seven-year-old grandson. R. 777. There were no specific mental status findings by Dr. Tikku, but it was noted that Claimant's GAF was 53. *Id*. Claimant's current medication was increased. R. 778.

On June 7, 2013, Claimant visited Dr. Tikku for a follow-up. R. 779-80. Dr. Tikku noted that Claimant appeared calmer, but Claimant reported that she continued to have difficulty with concentration and daily functioning. R. 779. Despite those self-reports, according to Dr. Tikku, Claimant's mental status and behavior were mostly unremarkable, Claimant was able to maintain attention, and her memory was intact. *Id*. Claimant's mood was described as euthymic and affect constricted, and her reasoning, impulse control, judgment, and insight, were described as fair. *Id*. Dr. Tikku determined Claimant's GAF to be 54 and stopped certain of Claimant's current medication in favor of others due to Claimant's complaints that she was not tolerating one of her medications well. R. 780.

On September 5, 2013, Claimant visited Dr. Tikku for a follow up. R. 781-83. Dr. Tikku noted the Claimant had a "somewhat brighter affect," and Claimant reported that she has been feeling anxious, but that she had been coping better with daily stressors. R. 782. As in all prior mental status examinations, according to Dr. Tikku, Claimant's mental status and behavior were mostly unremarkable, Claimant was able to maintain attention, and her memory was intact. *Id*. Claimant's mood was described as anxious and affect appropriate, and her reasoning, impulse control, judgment, and insight, were described as fair. *Id*. Dr. Tikku determined Claimant's GAF to be 54 and increased Claimant's current medication. R. 783.

On July 2, 2014, Dr. Tikku completed a "Medical Residual Functional Capacity Assessment." R. 1017-19. In that Assessment, Dr. Tikku checked boxes that indicated that for every, single, functional limitation, Claimant was "Moderately Limited." *Id*. At the end of the Assessment, Dr. Tikku wrote that Claimant "has had difficulty in all areas of functioning due to mental health issue." *Id*. at 1019. There is no indication as to what particular "mental health issue" Dr. Tikku is referencing, and Dr. Tikku provided no additional explanation concerning the functional limitations he endorsed via check mark. *Id*.

### Other Relevant Treatment Notes

In 2012, Claimant also visited with Dr. Dorna Broome-Webster, who, like Dr. Saleh, practiced at Florida Hospital Fish Memorial. During several visits with Dr. Dorna Broome-Webster, Claimant presented as negative for psychiatric symptoms, often with no unusual anxiety or evidence of depression, and with a mostly normal physical examination that included a normal range of motion. R. 650-55; 741-44; 747-49; 752-55; 757-60. Similarly, in 2013, Claimant treated with Dr. Chad Broome-Webster of Daytona Heart Group, whose treatment notes show that

Claimant had "been doing well," denied anxiety, depression and joint pain, and had a normal physical examination. R. 786-89; 790-93; 798-801; 803-06.

### The ALJ's Determination in Regards to those Opinions

The ALJ discussed Dr. Saleh's and Tikku's and opinions in the same paragraph, and assigned them no weight, explaining:

> As for the opinion evidence, I have considered the assessments offered by the claimant's treating physicians, Drs. Saleh and Tikku. A treating physician's opinion is given controlling weight only if it is well supported and not inconsistent with other substantial evidence. I find that the opinions in this case are not supported by objective clinical findings and are inconsistent with other substantial evidence. For example, Dr. Saleh regularly notes unremarkable findings (i.e. no back/spine abnormalities, no joint abnormalities, normal ranges of motion, no motor or sensory deficits, no tenderness, etc.) (Exhibits 25F, 26F, and 30F) and objective imaging of the claimant has found only minimal abnormalities (Exhibits 1F, 23F, and 32F). Moreover, Dr. Tikku's own record and records from Dr. Tikku's facility (i.e. Florida Hospital Fish Memorial) routinely note unremarkable finding as well and only occasionally note abnormalities in her mood and affect (Exhibits 18F, 27F, 31F, and 37F). Given these doctors' opinions, l would expect to see at least some consistent significant objective abnormalities during examinations. Therefore, these opinions are accorded no weight.

R. 52. Thus, the ALJ assigned both doctors' opinions no weight because those opinions were "not supported by objective clinical findings and are inconsistent with other substantial evidence." *Id*. The ALJ then discussed each doctor's opinion in turn, citing medical evidence within the record:

- Dr. Saleh regularly notes unremarkable findings (i.e. no back/spine abnormalities, no joint abnormalities, normal ranges of motion, no motor or sensory deficits, no tenderness, etc.) (Exhibits 25F, 26F, and 30F) and objective imaging of the claimant has found only minimal abnormalities (Exhibits 1F, 23F, and 32F).

- Dr. Tikku's own record and records from Dr. Tikku's facility (i.e. Florida Hospital Fish Memorial) routinely note unremarkable finding as well and only occasionally note abnormalities in her mood and affect (Exhibits 18F, 27F, 31F, and 37F).

*Id*. Finally, the ALJ concluded that: "Given these doctors' opinions, I would expect to see at least some consistent significant objective abnormalities during examinations. Therefore, these opinions are accorded no weight." *Id*.

Claimant argues that the ALJ failed to properly weigh the opinions of those doctors. Doc. 33 at 29-33. Citing *Winschel*, Claimant asserts that the ALJ erred because the doctors' opinions "are bolstered by evidence, and there is no evidence to support a contrary finding." *Id*. at 32. Claimant then discussed certain evidence that Claimant asserts supports the opinions of Dr. Saleh and Dr. Tikku, urging the Court to find that the evidence supports the doctors' opinions. *Id*. at 32-33.

The undersigned finds that the ALJ stated good cause to assign Dr. Saleh's opinion no weight. In explaining her reasons for giving Dr. Saleh's opinion no weight, the ALJ stated that Dr. Saleh, in her own treatment notes, regularly made unremarkable findings (i.e. no back/spine abnormalities, no joint abnormalities, normal ranges of motion, no motor or sensory deficits, no tenderness, etc.). In support of that explanation, the ALJ cited to Exhibits 25F, 26F, and 30F. Those exhibits contain the treatment notes of Dr. Saleh discussed in the foregoing paragraphs. The Court has reviewed those treatment notes, and finds that that the ALJ's conclusion is supported by substantial evidence. Indeed, the treatment notes not only of Dr. Saleh, but also of Claimant's other treating and examining physicians as discussed herein, show that Claimant overwhelmingly had normal physical examinations that resulted in unremarkable findings, normal strength, and normal range of motion. As further support for her conclusion, the ALJ explained that the

objective imaging of Claimant showed only minimal abnormalities, citing to Exhibits 1F, 23F, and 32F. Those exhibits include radiology reports from Drew Medical from 2008 and 2009 (Exhibit 1F, R. 452-55), radiology reports from LAD Imaging from 2012 (Exhibit 23F, R. 671-78), and treatment notes from PRC Associates (Exhibit 32F, R. 866-922).

The undersigned also finds that the ALJ stated good cause to assign Dr. Tikku's opinion no weight. In explaining her reasons for giving Dr. Tikku's opinion no weight, the ALJ stated that Dr. Tikku, in his own treatment notes and in records from Dr. Tikku's facility (i.e. Florida Hospital Fish Memorial), routinely made unremarkable findings, and only occasionally noted abnormalities in Claimant's mood and affect, citing to Exhibits 18F, 27F, 31F, and 37F. Those exhibits contain the treatment notes of Dr. Tikku discussed in the foregoing paragraphs. The Court has reviewed those treatment notes and finds that that the ALJ's conclusion is supported by substantial evidence. Indeed, as set forth in the foregoing paragraphs, the treatment notes not only of Dr. Tikku, but also of Claimant's other treating and examining physicians, show that Claimant overwhelmingly had normal examinations that noted Claimant's mental status and behavior as mostly unremarkable, and Claimant was able to maintain attention and her memory was intact. Other physicians noted normal psychiatric finding, no unusual anxiety or depression, or a denial of anxiety or depression. When Dr. Tikku did note anxiety or depression, there was no indication that it was of a severity that would result in an across-the-board "moderate limitation" in all of Claimant's mental health functions, as Dr. Tikku eventually opined.

The ALJ, in light of the foregoing, has stated good cause to assign no weight to Dr. Selah's and Dr. Tikku's opinions. Those reasons, as discussed above, are supported by substantial evidence, and, together, support the ALJ's decision to assign no weight to Dr. Selah's and Dr.

Tikku's opinions. Therefore, the Court finds that the ALJ did not err in assigning to Dr. Selah's and Dr. Tikku's opinions no weight.

Claimant also asserts that the ALJ erred in determining the RFC and posing the relevant hypothetical question to the vocational expert because the ALJ improperly failed to take into consideration Dr. Selah's and Dr. Tikku's opinions. Because the Court finds that the ALJ did not err by rejecting those opinions, the Court finds that the ALJ did not err in failing to include the functional limitations contained within those opinions when determining the RFC and posing the question to the vocational expert.

V. **CONCLUSION.**

For the reasons stated above, it is **ORDERED** that:

1. The final decision of the Commissioner is **AFFIRMED**; and

2. The Clerk is directed to enter judgment for Commissioner and close the case.

**DONE** and **ORDERED** in Orlando, Florida on September 7, 2017.

DANIEL C. IRICK
UNITES STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record

The Court Requests that the Clerk
Mail or Deliver Copies of this order to:
The Honorable Teresa J. McGarry
Administrative Law Judge
c/o Office of Disability Adjudication and Review
SSA ODAR Hearing Ofc.
Desoto Bldg., Suite 400
8880 Freedom Crossing Trail
Jacksonville, FL 32256-1224